**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA,**                      **CIVIL ACTION**


**VERSUS**                                          **NO. 12-321**
                                                    *Consolidated with NO. 12-322*
                                                    *& NO. 12-325*
                                                    *Pertains to all cases*


**ST. BERNARD PARISH**                              **SECTION "C" (1)**

<u>ORDER AND REASONS</u>

Before the Court are two motions by defendant St. Bernard Parish: (1) Motion to strike

expert's report and/or testimony of Allan McMillan Parnell, Ph.D. Rec. Doc. 178.  (2) Motion to

strike expert's report and/or testimony of Andrew A. Beveridge, Ph.D. Rec. Doc. 177.  Plaintiffs

oppose both motions. Rec. Docs. 196, 193.  Having considered the record, the memoranda of

counsel and the law, the Court DENIES the motions for the following reasons.

**I. BACKGROUND**

Plaintiffs filed these cases alleging violations of the Fair Housing Act, Title VIII of the

Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3631, and of 42 U.S.C. §§ 1981 and 1982, against

St. Bernard Parish.  The United States brought suit against St. Bernard Parish on January 31, 2012

in case number 12-321.  On the same day, Plaintiffs Greater New Orleans Fair Housing Action

Center ("GNOFHAC"), Kiana Alexander, Nancy Bain, Cody Belitz, George Dubois, Carolyn

Harris, Patricia Hendrix, David Jarrell, Al Neep, and Tonya Neep brought case number 12-322

1

against St. Bernard Parish, St. Bernard Parish Council, St. Bernard Parish Planning Commission, Craig Taffaro and several other defendants that have since been terminated from the case.   Case number 12-325 was also brought on the same day by NOLA Capital Group, LLC.  St. Bernard Parish and St. Bernard Parish Council are the remaining defendants in that case.

In the aftermath of Hurricanes Katrina and Rita in 2005, there was widespread flooding in St. Bernard Parish.  Plaintiffs contend that in response to the destruction and displacement caused by the hurricanes, St. Bernard Parish undertook to preserve its pre-hurricane demographics by enacting a series of zoning laws to block the availability of rental and multi-family housing. Case no. 12-325, Rec. Doc. 1 at 2.  Plaintiffs claim that the intent and effect of these zoning laws was to prevent African-Americans and other minorities from re-settling in St. Bernard Parish. *Id.*  This Court previously considered similar litigation alleging that St. Bernard Parish enacted zoning laws that constituted discriminatory housing practices in case number 06-7185 and others.  In that case number 06-7185, plaintiffs moved to enjoin an ordinance known as the "blood relative ordinance," which prohibited persons from renting, leasing, loaning, or otherwise allowing occupancy or use of any single-family residence other than by family members related by blood, without first obtaining a Permissive Use Permit from the St. Bernard Parish Council. Case no. 06-7185, Rec. Doc. 1.  The parties to case number 06-7185 entered a Consent Order in this Court in February 2008. *Id.* Rec. Doc. 114.  Pursuant to that order, St. Bernard Parish rescinded the blood relative ordinance and are permanently enjoined from re-enacting it.

The present cases concern Ordinance #697-12-06, which was enacted December 19, 2006 and took effect on January 4, 2007. Case no. 12-325, Rec. Doc. 1 at 8; Case no. 12-322, Rec.

Doc. 14 at 13.  The ordinance allegedly replaced the blood relative restriction and the conditional

use permit requirement with a new requirement that prohibited homeowners from renting out

single-family residences located in zone R-1 without first obtaining a permissive use permit

("PUP") from St. Bernard Parish Council.  Plaintiffs contend that enactment and the subsequent

enforcement of the PUP ordinance was intended to deny rental housing opportunities to African-

Americans. Case no. 12-321, Rec. Doc. 1, Case no. 12-322, Rec. Doc. 14, Case no. 12-325, Rec.

Doc. 1.  Defendants maintain that the ordinance was not part of any pattern or practice of

discriminatory conduct ever in place. Case no. 12-321, Rec. Doc. 28 at 3.  Defendants argue that

because St. Bernard Parish suffered catastrophic damage in the wake of Hurricanes Katrina and

Rita, unprecedented post-hurricane recovery planning and execution was required to rebuild their

community. *Id.* at 2.

Defendants seek to strike the expert report and/or testimony of Allan McMillan Parnell,

Ph.D.  Case no. 12-321, Rec. Doc. 178 (hereinafter all Rec. Doc. citations refer to lead case

number 12-321).  Dr. Parnell is a demographer with a Ph.D. in Sociology from the University of

North Carolina at Chapel Hill. *Id.*, Exh. A, Attachm't A.  His expert report assesses the need for

affordable housing in St. Bernard Parish, Louisiana, in the post-Katrina period of 2006-2010. *Id.*,

Exh. A.  Defendants move to strike the report and testimony under Federal Rules of Evidence,

Rule 702, because Dr. Parnell does not indicate in his report that he has ever had contact with St.

Bernard parish or "ever even set foot in the Parish for any purpose whatsoever." *Id.* at 2.

Defendant also moves to strike Dr. Parnell's report and testimony because one of the sources on

which he relies is a report by Kalima Rose who has also acknowledged that her only physical

contact with the Parish consisted of bus tours taken after writing her report. *Id.*

Defendants also seek to strike the expert report and/or testimony of Andrew A. Beveridge, Ph.D.  Dr. Beveridge is a professor sociology with a Ph.D. from Yale University. Rec. Doc. 193 at 2.  He is an expert in demography, and statistical and quantitative analysis of social science datasets including census data, survey data and administrative records. *Id.* at 2-3.  Defendants move to strike the report and testimony for the same reasoning that they move to strike Dr. Parnell's–because he does not indicate in his report that he has had contact with St. Bernard Parish–and because they allege his methodology's utilization of "proportional numbers" instead of "absolute numbers" is clearly erroneous and incorrect as a matter of law. Rec. Doc. 177 at 2 & 6.

## II. LAW AND ANALYSIS

### A. Legal Standard for Admissibility of Expert Witnesses

Rule 702 of the Federal Rules of Evidence mandates that a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." FED.R.EVID. 702.  A witness who is qualified as an expert may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  *Id.*  A trial judge acts as a gate-keeper for admitting expert witnesses. *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993).  The current standard for admissibility was

articulated by the United States Supreme Court in *Daubert*. *Id.*

The *Daubert* Court began with the "baseline" principle that "all relevant evidence is admissible" unless excepted by the Constitution, a statute or rule and that the standard of relevance "is a liberal one." FED.R.EVID. 402; *Daubert*, 509 U.S. at 585-589.  The Court said: "the subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589-590.

The Court suggested several factors that the trial court should use in determining reliability.  Of particular importance is whether "the theory or technique . . . can be (and has been) tested." *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796.  Another factor is whether the theory or technique has been subjected to evaluation by peer review and publication. A third factor is the known or potential rate of error in the technique and the existence and maintenance of standards governing its operation.  A final consideration is whether the theory or technique has been generally accepted in the scientific community. *Id.*

The Court explained that the requirements for an expert as opposed to an ordinary witness were stringent because "an expert is permitted wide latitude to offer opinions including those that are not based on firsthand knowledge or observation." *Id.* at 592.  While the Court noted that Rule 702 requires the expert's evidence or testimony to assist the trier of fact to understand the evidence or determine the fact at issue, it made clear this assistance was to come from scientific analysis, not first-hand experience.

**B. Admissibility of Dr. Parnell's expert report and/or testimony**

Defendants' assertions that Dr. Parnell's expert report and testimony should be stricken because he and the author of a report he relies on do not have personal knowledge of St. Bernard Parish is misguided.  As explained above, the purpose of the *Daubert* test is to determine the reliability of the expert's methodology. *Id.* at 592-93; *Bocanegra v. Vicmar Servs., Inc.,* 320 F.3d 581, 584 (5th Cir. 2003).

Defendants rely on the case *Andrews v. City of Monroe* to argue the plaintiffs' expert should be excluded. 513 F. Supp. 375 (W.D. La. 1980), *aff'd*, 658 F.2d 959 (5th Cir. 1981).  The *Andrews* case concerned alleged racial segregation and discrimination in the operation of the Monroe City public schools. 513 F. Supp. 375 at 378.  After the court issued a permanent injunction prohibiting the defendants from operating a "compulsory bi-racial school system," various litigation and attempts at a solution occurred before a consent decree was approved on July 30, 1971. *Id.*   There  were then several decrees or plans signed by the court including a "freeze order," and ultimately in 1977 ten white parents moved to intervene on behalf of their minor children to attack the validity of a 1973 plan. *Id* at 379.  The court agreed with the interveners that the desegregation plan should be reexamined. *Id.*

In evaluating the desegregation plan, the government sought to qualify Ms. Diana May Pearce as an expert witness to testify on the effects of segregated schools on the housing patterns of the Monroe area and the court refused to do so. *Id.* at 392.  The court explained that when deposed, Ms. Pearce "knew absolutely nothing about the metropolitan area and had no opinion concerning the effect of residential housing patterns on the racial composition of the area

6

schools." *Id.* at 393.  Although the court explained that Ms. Pearce then traveled to Monroe and

spent a day in the area before her testimony and only visited the school system for a few hours, it

does not state that the reason Ms. Pearce could not be qualified as an expert was because she had

not spent enough time in Monroe.  Rather, the court explained that "[g]eneral textbook theories

may not be applied across-the-board in such a complicated matter." *Id.*  Although this case

predates *Daubert*, this statement appears to be an articulation that the expert must assist the trier

of fact to understand the fact at issue. *Daubert*, 509 U.S. at 580.  It is understandable that

defendants may have confused the *Andrews* court's language discussing "the opportunity to view

the individual situation" as a requirement to see the situation in person, but the application goes

against *Daubert*, which requires an expert to analyze the individual situation, but not to conduct

that analysis by a personal visit to the area.

Similarly, the fact that one of the authors of the reports Dr. Parnell relies on, Kalima Rose,

has only taken a bus tour of St. Bernard Parish after writing her report, is irrelevant to her

statistical analysis. Rec. Doc. 178 at 5.  This argument is particularly weak considering this Court

has twice before qualified Ms. Rose as an expert on the same subject discussed here. Rec. Doc.

196, Exhs. A & B.  The statement from Ms. Rose that Dr. Parnell cites and defendant contests for

lack of personal knowledge is that "FEMA estimated that 76,977 rental units in the MSA and

5,936 rental units in St. Bernard Parish were damaged by the hurricanes." Rec. Doc. 178 at 5.  It

would have been a burdensome endeavor, duplicative of the U.S. Census, for Dr. Parnell to

collect all this data himself.  Defendants have not questioned the statistical analysis or acceptance

of Dr. Parnell's social science practices while undertaking his demographic study, which would

have been an appropriate question for the gate-keeping efforts and reliability determinations of this court.

**C. Admissibility of Andrew A. Beveridge, Ph.D.'s expert report and/or testimony**

Defendants' argument that Dr. Beveridge's expert report and/or testimony should be excluded because his report does not indicate he has ever been to St. Bernard Parish is denied for the same reasons detailed above. Rec. Doc. 177 at 5. Defendants' argument that Dr. Beveridge's expert report and/or testimony should be excluded because his methodology is clearly erroneous and incorrect is one more properly analyzed by this Court. *Id.* at 6. However, defendants do not take issue with the reliability of the sources of information Dr. Beveridge used to draft his report. Rec. Doc. 193 at 5.

Defendants claim the methodology Dr. Beveridge used in analyzing disparate impact in this case is clearly erroneous because it goes against the standards set by the United States Supreme Court in *Wards Cove Packing Company, Inc. v. Antonio*. 490 U.S. 642 (1989). Rec. Doc. 177 at 13. Defendants do not provide a detailed argument of how Dr. Beveridge's methodology is contrary to that which has been accepted by the Supreme Court. Rather, they cite to the text of the report[1] and state it is clearly contrary to the standards in *Antonio*, an employment

---

[1] It appears defendants take issue with the section of Dr. Beveridge's report where he states: "8) Using PUMS data from the 2006-2010 American Community Survey for the area that is primarily the New Orleans MSA, we find that non-Hispanic black households comprise 29.9 percent of all households, while non-Hispanic whites comprise 60.5%. Yet some 50.1 percent of non-Hispanic black households are renters while only 24.6 of non-Hispanic white households are renters. Thus the odds ration of black household being renters to white households being renters is 2.0 to 1. Therefore anything

discrimination case, which defendants argue applies to housing as it has in *Summerchase Ltd. Partnership I v. City of Gonzalez*. 970 F. Supp. 522, 529 (M.D. La. 1997). It appears that defendants are asserting that Dr. Beveridge's opinions should be stricken because he compared the proportions rather than the absolute numbers of African-American households and white households in the area likely to be affected by the PUP ordinance. Rec. Doc. 177 at 6-15.

As explained above, when a court assesses the admissibility of an expert's report or testimony, it should evaluate the expert's reliability. The Supreme Court said in *Daubert* that reliability should be tested based on whether the theory or technique has been 1) tested, 2) subjected to evaluation by peer review and publication, 3) evaluated for a known or potential rate of error and 4) accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.  Here, defendants do not argue that the theory or technique should be excluded because it fails any of these four tests.  Defendants only argue that it is a technique that should be excluded based on *Antonio*, 490 U.S. at 652, as applied in *Summerchase*, 970 F. Supp. at 528-30.

In *Antonio*, the Court overturned the Court of Appeals because it concluded that the practice it had ruled in favor of would have amounted to establishing a quota system for accepting nonwhite workers. *Antonio*, 490 U.S. at 653.  It found that: "the percentage of nonwhite workers found in other positions in the employer's labor force is irrelevant to the question of a prima facie statistical case of disparate impact." *Id.*  In other words, the Court ruled that the disparate impact analysis had been conducted using the wrong proportionate numbers.  The Court did not rule that

---

that would restrict the availability of rental housing would affect non-Hispanic blacks much more than non-Hispanic whites." Rec. Doc. 177 at 13.

proportionate analysis was always inappropriate.

When *Summerchase* did a disparate impact analysis in the context of Fair Housing, the trial court found that summary judgment should be granted because "absolute numbers" should apply to the statistical analysis done to find disparate impact. *Summerchase*, 970 F. Supp. at 530. The trial court referred to "absolute numbers" as those that are statistics based solely on the population in the region eligible for the Summerchase development and "proportionate numbers" as "statistics for the entire population in the region, not just on the population eligible for the Summerchase Development." *Id.* 528-29.  In its analysis relying on "absolute numbers," the Court found that the households most likely to reside in the Summerchase Development earned between $5,000 and $16,153 annually.  It found that: "Of these eligible or most likely residents, 77.9% are white, 20.0% are black, and 2.1% are of other races." *Id.* at 530.  It concluded that there was no disparate impact on minorities since whites are affected at a ratio of approximately 3 1/2:1 over blacks and other minorities.  Thus, while the *Summerchase* court called the analysis one that was based on "absolute numbers," it was conducting the same type of proportionate analysis done by Dr. Breveridge in the present case. Rec. Doc. 177-2.

This Court has previously allowed disparate impact analysis based on proportional numbers. *See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 567 n.3 (E.D. La. 2009) ("*GNOFHAC I*"); *Greater New Orleans Fair Hous. Ctr., Inc. v. St. Bernard Parish*, No. 06-7185, 2011 WL 4915524, at *6-*7 (E.D. La. Oct. 17, 2011) ("*GNOFHAC IV*").  This analysis is necessary because in order to show that there has been a violation under the Fair Housing Act for discrimination based on disparate impact, a plaintiff

10

must demonstrate that a facially neutral policy or practice "exerts a racially disproportionate effect on minorities." *Huntington*, 844 F.2d 926, 936 (2d Cir. 1988); *Bonasera v. City of Norcross*, 342 F. App'x 581, 585 (11th Cir. 2009) (noting that the court has in the past found that it may be inappropriate to rely on "absolute numbers rather than on proportional statistics"); *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 17 (D.Conn. 2011) (relying on proportionate numbers rather than absolute numbers to find a facially neutral policy has a disparate impact on a particular group).

The Court finds that Dr. Beveridge's report and/or testimony should not be excluded because he conducted analysis based on proportional numbers.  The parties may bring issues that go to the weight of the opinion rather than reliability of Dr. Beveridge's report and/or testimony to the jury, not this Court. *United States v. Valencia*, 600 F.3d 389, 429 (5th Cir. 2010).

Accordingly,

IT IS ORDERED that defendants' motion to strike expert's report and/or testimony of Allan McMillan Parnell, Ph.D. is DENIED. Rec. Doc. 178.

IT IS FURTHER ORDERED that defendants' motion to strike expert's report and/or testimony of Andrew A Beveridge, Ph.D. is DENIED. Rec. Doc. 177.

New Orleans, LA, this 2nd day of April, 2013.

HELEN G. BERRIGAN
UNITED STATED DISTRICT JUDGE